SHEPHERD, J.,
dissenting.
The only issue before the trial court was whether the failure of the KT entities to raise mutual mistake in the Tampa lawsuit was an intervening cause of the loss of the aircraft. As the law firm and attorney defendants describe in their answer brief:
In the trial court, Akerman and two of its shareholders who were also sued in this action, Carlos J. Deupi (“Deupi”), and Stewart H. Lapayowker (“Lapay-owker”) (collectively, the “Akerman Attorneys”) moved for summary judgment on grounds that the MacKnight Companies caused their own damages by failing to present the winning defense of mutual mistake in the Tampa Lawsuit. Solely to avoid manufactured issues of fact, and to narrow the issues before the trial court to the single issue of the circumstances of the Tampa Lawsuit, the Akerman Attorneys conceded — for purpose of their Motion for Summary Judgment only — negligence in allowing the Asset Agreement to convey the Airplane. (Emphasis added).
The trial court granted summary judgment to the Akerman Attorneys[8] on that narrow ground:
Because Plaintiffs failed to raise the mutual mistake in the Tampa Lawsuit, Defendants are granted partial summary judgment on Counts I and II of the Complaint, and Plaintiffs shall not recover any damages resulting from the Final Judgment entered against them in the Tampa Lawsuit, including, without limitation, Plaintiffs damages from the loss of title to, and the right to legal possession of the Airplane. (Emphasis added).
The majority, however, exceeds its review authority — limited to conducting a de novo review of the order appealed — -and grants appellate summary judgment to the Aker-man Attorneys on an incomplete record. The majority justifies its decision with the comment “[tjhere is no justice” in any other result. See Maj. Op. at 67. I would reply that there is no justice in granting appellate summary judgment against a party without notice and due process, which is what this Court is doing today, contraiy to the tenets upon which this Court has operated since its formation.
This may be a thin liability case. The KT Holdings plaintiffs admit as much, alleging only the Akerman Attorneys are comparatively responsible for the loss of their airplane. While the Akerman Attorneys advised Mr. Brown not to title the airplane in the name of MacKnight Smoked Foods, evidence also exists in the record that the Akerman Attorneys con *68 sidered it their responsibility to be sure the aircraft did not need to be scheduled. For example, three weeks before the Smoked Foods closing, Carlos Deupi, the Akerman partner in charge of the transaction, called Stewart Lapayowker, an Aker-man aviation specialist, to follow up on the jet. Mr. Lapayowker responded with an e-mail stating:
Sorry, I listened to your voicemail. I’ll touch base with Jon [Brown] and confirm. I think he was going to take the path of least resistence (sic) and put the aircraft in the Holding Company even if it cost him a bit more in sales/use tax. He didn’t seem to want to apply any infrastructure/personnel to administering the other suggested structures. Again, I’ll confirm. SHL.
As Mr. Lapayowker admitted in his deposition, he never spoke with Mr. Brown and never followed up with Mr. Deupi. Likewise, Mr. Deupi never followed up with Mr. Lapayowker and never did anything further to be certain the jet did not need to be scheduled.[9] The majority fails to mention this testimony from the record. It also overlooks the KT entities were not required to negate any evidence that the Akerman Attorneys were not negligent.
The majority finds the final judgment in the Tampa lawsuit, awarding the aircraft to MSF, so “incomprehensible in light of the undisputed facts and the applicable New York law” that it finds it necessary to float — but, tellingly, falls short of taking ownership of — a post-Tampa Aircraft Final Judgment conspiracy theory to, in its own words, “provide some insight into why the trial court may have ruled as it did.” See Maj. Op. at 66. At the same time, the majority fails to relate a significant fact— namely the trial judge made an express finding of fact that the [Smoked Foods Asset Purchase Ajgreement “is complex, but it is not ambiguous, and by the specific terms thereof, ownership and title to the aircraft is vested in Plaintiff [MSF].” (Emphasis added). Sanctity of contract, when unambiguous, is a first principle of our jurisprudence. See Perry Banking Co. v. Swilley, 154 Fla. 221, 17 So.2d 103, 104 (1944) (“Sanctity of contract is fundamental in the law of this country, so much so that it is protected by the Constitution.”). It yields only under the most exacting of circumstances.
Reformation is one of those circumstances, and for the reason just stated, the proof required is accordingly not only exacting but rigorously scrutinized. Under New York law, just as under Florida law, reformation is permitted where there is a mutual mistake, e.g., “where the parties have a real and existing agreement on particular terms and subsequently find themselves signatories to a writing which does not reflect that agreement.” Harris v. Uhlendorf, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892, 894 (1969); see also Circle Mortgage Corp. v. Kline, 645 So.2d 75, 78 (Fla. 4th DCA 1994) (“A mistake is mutual when the parties agree to one thing and then, due to either a scrivener’s error or inadvertence, express something different in the written instrument.”). The rationale for reformation is that a court sitting in equity does not alter the parties’ agreement, but allows the defective instrument to be corrected to reflect the true terms of the agreement the parties actually reached. N.E. Shares Corp. v. Int'l Ins. Co. of N.Y., 240 A.D. 80, 269 N.Y.S. 351, 354 (N.Y.App.Div.1934); see also Circle *69 Mortgage Corp., 645 So.2d at 78. In addition, to further assure the sanctity of contracts, the reformation proponent must prove the existence of the prior agreement by clear and convincing evidence. Migliore v. Manzo, 28 A.D.3d 620, 813 N.Y.S.2d 762, 764 (N.Y.App.Div.2006) (“A party seeking to invoke equity to reform a written agreement based upon a purported mistake bears the burden of showing a mutual mistake by clear and convincing evidence.”); see also BrandsMart U.S.A. of W. Palm Beach, Inc. v. DR Lakes, Inc., 901 So.2d 1004, 1006 (Fla. 4th DCA 2005) (“Due to the strong presumption that a written agreement accurately expresses the parties intent, the party seeking reformation based on a mutual mistake must prove its case by clear and convincing evidence.”).
In this case, the instrument was not defective. MacKnight Smoked Foods intended to sell all of its assets except those on the “Excluded List.” MSF contracted to buy all of the assets of Smoked Foods, unless the asset was listed on the “Excluded List.” Only Jon Brown knew about the aircraft. It was his mistake, allegedly worsened through a lack of diligence by the Akerman Attorneys, in failing to list the aircraft on the “Excluded List.” Under New York law, “[t]o reform a written instrument based upon mutual mistake, the proponent of reformation must show, by clear and convincing evidence, not merely that a mistake exists, but exactly what the parties agreed upon.” Miller v. Seibt, 13 A.D.3d 496, 788 N.Y.S.2d 126, 127 (N.Y.App.Div.2004). There is no definition of “mutual” that can be stretched to encompass these facts.
A careful reading of the majority opinion reveals the majority improperly reached the merits of the KT entities’ case. The majority concludes, “MSF’s claim to the aircraft was refuted as a matter of law by the simple fact that it did not know about, bargain for or pay for the jet.” See Maj. Op. at 66. That conclusion, of course, does not equate to the doctrine of mutual mistake under New York law. See supra pp. 63-64. It is simply the majority’s evaluation of the evidence, which is contradicted by the core provision of the purchase agreement that the trial court in the Tampa case found unambiguous:
“[A]t the Closing, the Buyer [MSF] shall purchase from MacKnight [Smoked] Foods and MacKnight [Smoked] Foods shall sell, transfer, assign and deliver to Buyer, all of the right title and interest in and to all of the tangible and intangible assets, business, goodwill and rights of MacK-night [Smoked] Foods, other than the Excluded Assets ... as the same shall exist immediately prior to Closing.” (Emphasis added).
It is also contradicted by the testimony of MSF’s representative and chief negotiator, Felix Wong, that while he admittedly was “not aware of the airplane pre-closing, when I valued the business and made the offer, it was for all of the assets, regardless of what they were or whether we knew about them.”[10] Even if the appel *70 late summary judgment was permissible under our Rules, it would be error to grant summary judgment to the Akerman Attorneys on the record in this case.
It may have been, upon a trial of this case, a jury would have exonerated the Akerman Attorneys. It also may be (put me in the doubtful category), that the Ak-erman Attorneys have a meritorious basis for summary judgment on a ground other than the one on which they erroneously prevailed below. If so, however, it is our duty to require the Akerman Attorneys to accomplish it — as we require of all litigants — the old-fashioned way; they should earn it.
I would reverse this case for further proceedings.

. For the reader's convenience, I will include the law firm in this appellation throughout this dissent.

. As Akerman aviation specialist Lapayowker must have known, an electronically assisted aircraft tide search of the records of the Federal Aviation Administration (FAA) in Oklahoma City, Oklahoma, prior to the closing also would have readily revealed how the aircraft was titled.

. Any intimation by the majority that MSF valued MacKnight Smoked Foods based upon any "appraised values” of assets is incorrect. See Maj. Op. at 64. In response to the question, "Tell me how you came up with the price for MacKnight,” Wong replied:
What we did was we looked at the historical performance of the company on an adjusted basis. We did as much industry research that we could on the consumption of salmon, consumption of smoked salmon, examined all kinds of information, anything that we could get our hands on to give us a clue as to, you know, how quickly the company might grow during our ownership period if we were successful in buying it.
*70 Wong further testified unequivocally that MSF did not perform an investigation of all of the assets of Smoked Foods. He was asked:
Q. But at the time that you did your valuation, did you perform some investigation of the assets of significant value?
A. No.
Q. Why Not?
A. We don’t value businesses based upon assets.
Q. Okay. As part of the due diligence was anything done to confirm value, condition or title to the significant assets?
A. A lien search would have been conducted, but that would have been done primarily by the attorneys to make sure we have good title to the various assets. No attempt was made to identify every asset that was being acquired. The assumption was that everything was being conveyed. ...”